# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 1:22-cr-00576-4 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| LESLIE MURCHISON | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Leslie Murchison was charged with possession with intent to distribute 40 grams or more of a controlled substance in violation of 21 U.S.C. § 841(a)(1). Murchison moved to suppress evidence of the narcotics obtained through law enforcement's search and seizure of his automobile. For the reasons explained below, the Court denies Murchison's motion to suppress [216].

## BACKGROUND

The following facts are drawn from the documentary and testimonial evidence on the record. In June 2022, the Federal Bureau of Investigation ("FBI") was investigating Murchison's co-defendant, Toney Montgomery, as part of a larger drug trafficking organization operating in Dolton, IL. The main "case agent" directing the FBI's investigation was FBI Special Agent Michael Ganley. The Cook County Sheriff's Police ("CCSP") was assisting the FBI with its narcotics investigation. While assisting such investigations, CCSP would typically conduct traffic stops or street stops of individuals to identify them or to locate suspect narcotics. The CCSP conducts the stops to maintain the appearance of a routine traffic stop (rather than the FBI stopping the subject and raising suspicions about an investigation). Task Force Officer ("TFO") Anthony Aguirre of the CCSP was the overseeing "case agent" for the CCSP team assisting with the FBI's investigation.

As part of the investigation, a confidential source working for the FBI purchased narcotics in "controlled buys" at Montgomery's auto body shop, Riverdale Body Shop, on four occasions.

1

Accordingly, agents began surveillance of Montgomery and the shop, placing a pole camera outside the Riverdale Body Shop and monitoring Montgomery's phone calls via an authorized wiretap.

In the afternoon of June 29, 2022, FBI Special Agent Michael Barker was working in the "wire room," where law enforcement listened to the intercepted calls in real-time and watched live pole camera footage. He monitored calls from a wiretapped "target phone" used by Montgomery and kept watch on the contemporaneous pole camera video. The agent monitoring the target phone during the previous shift before Agent Barker recorded a call at 3:38 p.m. in which Montgomery stated he would "be at the shop in … about that time," to which an individual (whom the FBI later identified as Murchison) replied, "About an hour? Okay …." Montgomery called Murchison at 5:03 p.m to inform him he was "pulling up now," to which Murchison replied that he was "on [his] way." Agent Barker listened to an intercepted call at 5:04 p.m. between Montgomery and Murchison in which he requested a "50 ball" and was instructed to meet Montgomery at "the shop." Based on his experience with narcotics trafficking, Agent Barker understood a "50 ball" to mean a quantity of illegal drugs.

Agent Barker was advised to notify the case agents of any important phone calls he heard and mark any such calls as "pertinent" to the investigation. Following agency procedure, Agent Barker marked the "50 ball" call as "pertinent" and prepared a "line sheet" for the call. The "line sheet" included information automatically populated by the computer system such as the date, time, and length of the call, whether the call was incoming or outgoing, and the phone numbers associated with the call. Agent Barker also wrote a summary of the call's contents to include in the line sheet. Agent Barker testified that, based on what he heard in the call, he "would have" contacted at least one of either Agent Ganley or TFO Aguirre by phone to inform them of a potential impending drug deal. However, he stated he "would have advised both" Agent Ganley and TFO Aguirre over text message.

Live pole camera footage showed Montgomery arriving at the body shop at 5:10 p.m. Soon after at 5:31 p.m., Murchison arrived in his vehicle and entered the Riverdale Body Shop. Agent

Barker testified that he "would have" told the case agents about the vehicle's arrival, and that he in fact believed that the individual arriving at 5:31 p.m. was the same person who requested the "50 ball." The pole camera later captured Murchison leaving Riverdale Body Shop at 6:44 p.m. and driving away at 6:50 p.m. Agent Barker again claimed that he "would have" informed the case agents of the vehicle's departure from the body shop. After Murchison left the body shop, law enforcement officers maintained "constant surveillance" of him.

By that point in the day, CCSP had already become involved with surveilling Murchinson. TFO Aguirre stated in an interview on January 26, 2026 that he was aware of Montgomery's intercepted calls discussing a potential distribution of narcotics. Lieutenant (then a Sergeant) Bruce Steinke of the CCSP testified that sometime before the "50 ball" call, TFO Aguirre informed him of the FBI's ongoing drug investigation and that "there was potentially a drug transaction occurring." TFO Aguirre asked if CCSP officers would be "willing to assist" with a traffic stop after the FBI obtained information on the vehicle of interest. After the FBI intercepted the "50 ball" call at 5:04 p.m., TFO Aguirre requested that CCSP officers take over surveillance of the vehicle after the driver left the body shop. He also directed CCSP officers to conduct a stop on the vehicle. Lieutenant Steinke traveled to the surveillance area around Riverdale Body Shop in a covert vehicle and maintained contact with his CCSP team over radio. He informed the CCSP K-9 unit that it should be prepared to assist with the investigation.

Lieutenant Steinke testified that he received a phone call from TFO Aguirre, who provided a description of Murchison's vehicle and stated that the vehicle was approaching westbound Interstate 94. He confirmed to TFO Aguirre that CCSP located the correct vehicle by repeating identifying information about the vehicle (such as a description of the vehicle and the license plate) back to TFO Aguirre. As he was following Murchison, Lieutenant Steinke called out traffic infractions on the radio as he witnessed them from Murchison's vehicle, including speeding and failure to use a turn signal.

3

At 6:56 p.m., Lieutenant Steinke, accompanied by other CCSP officers, stopped Murchison in his vehicle. Murchison declined to give consent to a search of his car. The Cook County K-9 unit then conducted a K-9 sniff outside the vehicle before officers entered the vehicle themselves to conduct a search. After uncovering no evidence or contraband, the officers placed the dog inside Murchison's car. They continued to search the vehicle until they recovered 50 grams of narcotics, including fentanyl, from under the driver's seat.

**PROCEDURAL HISTORY**

Murchison filed this motion to suppress on October 8, 2025 on the basis that the investigative stop was unconstitutional for lack of reasonable suspicion of criminal activity, and that the subsequent search of his vehicle was not based on probable cause. The government argued that officers had probable cause to stop and search Murchison's vehicle based on the pole camera surveillance footage and the "50 ball" call, drawing the "commonsense" inference that the "50 ball" caller was the same person who arrived at the Riverdale Body Shop after Montgomery. Murchison responded that the government failed to show that any officer heard the "50 ball" call prior to the investigative stop and therefore had information sufficient to support a reasonable suspicion.

On February 2, 2026, the Court determined that it lacked sufficient information to rule on Murchison's motion. The Court ordered an evidentiary hearing to determine what information law enforcement relied upon in conducting the stop and search, and whether that information was sufficient to establish probable cause. The evidentiary hearing was held on February 19, 2026. The government called Agent Ganley, Agent Barker, and Lieutenant Steinke as witnesses, and the parties presented additional documentary evidence. The parties thereafter filed posthearing briefs with further argument based on the evidence presented at the hearing.

**LEGAL STANDARD**

The Fourth Amendment requires law enforcement officers to have "articulable and reasonable suspicion" that a "vehicle or an occupant is [] subject to seizure for violation of law" to conduct an investigative stop of a car. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Whether officers had reasonable suspicion to seize a defendant's car depends on facts known by the officers at the time of the search and seizure, not information "gained in hindsight." *Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012). The government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020) (citing *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014)).

Under the Fourth Amendment officers must also have probable cause to conduct a warrantless search of a vehicle. *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026 (7th Cir. 2022). "Probable cause" means that there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) (citing U.S. Const. Amend. IV). The government again bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause. *Peters*, 743 F.3d at 1116 (citations omitted).

**DISCUSSION**

Murchison asserts that evidence of the narcotics Murchison possessed must be suppressed because the search and seizure of his vehicle was unconstitutional. Specifically, he argues that officers lacked knowledge both to form a reasonable suspicion justifying the investigative stop and to have probable cause to search his vehicle. Additionally, Murchison claims that, even if the surveillance was sufficient to support the requisite levels of suspicion, only the FBI possessed that knowledge, not the

CCSP officers who stopped Murchison, and that those officers could not have had a reasonable suspicion nor probable cause themselves. The Court addresses each argument in turn.

## I. Reasonable Suspicion and Probable Cause

First, the Court agrees that a reasonable suspicion to stop Murchison's vehicle is supported by the evidence. The evidence shows FBI officers knew sufficient facts to reasonably believe that Murchison was subject to seizure after he left the body shop. Specifically, it was reasonable to infer that the driver of the vehicle that left the Riverdale Body Shop at 6:44 p.m. was the "50 ball" caller[1] based on the sequence of events: Montgomery received a call from an individual at 3:38 p.m. on June 29, 2022, whom Montgomery told that he would "be at the shop in … about that time." The individual responded "About an hour? Okay …." Montgomery informed the same caller that he had arrived at the shop an hour and 25 minutes later, to which the caller replied that he was on his way. The same caller then made the request for a "50 ball," which law enforcement understood to be a "common term to describe 50 grams of narcotics." Indeed, multiple "controlled buys" had occurred at the Riverdale Body Shop, and a driver arrived at that very body shop 27 minutes after the "50 ball" request. Having monitored these events as they occurred in real-time,[2] officers reasonably suspected that the driver possessed narcotics when he left the shop.

The Court further finds that these facts sufficiently support a finding of probable cause to search Murchison's vehicle. As explained, officers had sufficient reason to believe that Murchison was committing an offense, namely possessing narcotics. Law enforcement officers may search a

---

[1] The parties do not dispute that the driver and the "50 ball" caller were both Murchison. While Agent Ganley testified that, when Murchison's vehicle arrived at the body shop on June 29, 2022, investigators had not yet identified the driver, the fact that his identity was revealed only after the stop does not change the Court's conclusion that it was reasonable to infer that the driver and caller were the same person.

[2] Murchison also points out that the line sheets for the intercepted calls were "altered retroactively" because some were changed from classified as "pertinent" to "administrative." However, the timestamps on the line sheet indicate that agents had summarized calls as they listened to them.

vehicle without a warrant "where there is probable cause to believe that illegal substances are present." *United States v. Hays*, 90 F.4th 904, 907 (7th Cir.), *cert. denied*, 144 S. Ct. 2530, 219 L. Ed. 2d 1205 (2024) (citing *Wyoming v. Houghton*, 526 U.S. 295, 300–02, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). Officers may search all areas within a car "'where they have probable cause to believe contraband or evidence is contained.'" *Hays*, 90 F.4th at 907 (quoting *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)). Again, the FBI heard the in real-time call in which they believed Murchison requested a quantity of narcotics from Montgomery, then soon after witnessed him arrive at a location where multiple narcotics deals had occurred. *See id.* (finding that the fact that "officers knew that [the defendant] was recently seen at a known drug trafficking location" before the stop provided additional support for probable cause). Given the circumstances leading up to and during the stop, "viewed from the position of a reasonable police officer," *United States v. Hines*, 449 F.3d 808, 815 n.7 (7th Cir. 2006), the Court agrees that officers had probable cause to believe that Murchison had purchased narcotics and possessed them inside his vehicle.

## II.     Officers' Knowledge at the Time of the Stop

### a.    *Collective Knowledge Doctrine*

FBI Agent Michael Barker heard the "50 ball" call and watched the pole camera footage, which gave rise to the reasonable suspicion and probable cause to stop and search Murchison's vehicle. However, the investigative stop was carried out by CCSP, not Agent Barker, nor Agent Ganley, nor TFO Aguirre. Thus, the government must establish grounds for reasonable suspicion based on what local officers, not FBI agents, knew at the time of the stop. To support its assertion that local officers possessed adequate knowledge, the government relies upon the "collective knowledge" doctrine.

The collective knowledge doctrine permits an officer "to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United*

7

*States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).  There is no Fourth Amendment violation if the knowledge of the stopping officer, or the collective knowledge of the agency for which he works, is sufficient to support a reasonable suspicion.  *United States v. Harris,* 585 F.3d 394, 400 (7th Cir. 2009).  As the Seventh Circuit explained:

> In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.

*Williams*, 627 F.3d at 252–53 (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)).

Under the doctrine, "[t]he police who actually make the arrest need not personally know all the facts" that constitute probable cause "if they reasonably are acting at the direction of another officer or police agency."  *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (quoting *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998)).  The Seventh Circuit has explained what the government must show for the collective knowledge doctrine to apply.  Before the Court undertakes its analysis it is worth reviewing how the Seventh Circuit has applied its standards.

In *United States v. Rodriguez*, the Seventh Circuit determined that federal law enforcement developed "good grounds for articulable suspicion" based on wiretap and surveillance evidence suggesting an impending drug transaction.  831 F.2d 162, 165 (7th Cir. 1987).  Based on that knowledge, federal agents requested that state law enforcement conduct a traffic stop of the defendant.  *Id.*  The defendant challenged the constitutionality of the stop because it was based on the "admittedly skeletal message" that federal law enforcement requested a "routine traffic stop."  *Id.*  But the court concluded that the state officer conducting the stop "had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving rise to the suspicion."  *Id.* at 166.  The Court noted that the vehicle to be stopped was pointed out specifically by federal law

8

enforcement, and the state officer knew that federal agents were coordinating a large-scale drug investigation with local agencies. *Id.* Thus, state law enforcement was "merely acting as an 'extension' or agent" of federal law enforcement and could act on those agents' suspicions. *Id.*

Similarly, in *United States v. Celio*, the Seventh Circuit again upheld the constitutionality of a vehicle search based on the collective knowledge doctrine. In that case, federal agents requested that Illinois State Police stop defendants, as they believed that defendants were smuggling drugs based on intercepted calls and real-time surveillance. Those agents did not provide state officers with "the intricate details of its surveillance," but did "provide them with the location and direction of a specific vehicle and its suspected contents." 945 F.2d 180, 183–84 (7th Cir. 1991). The upshot of these cases is that "when officers are in communication with each other" while working together, "their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Nafzger*, 974 F.2d at 911 (citing *United States v. Edwards,* 885 F.2d 377, 382 (7th Cir. 1989)).

Compare such circumstances with *United States v. Ellis*, in which the Seventh Circuit found that the collective knowledge doctrine was inapplicable. In *Ellis*, one officer was stationed at the door of defendant's home, while another officer was stationed at the side of the house. 499 F.3d 686, 690 (7th Cir. 2007). From inside the home, the defendant told the officer at the door that he did not live there and that there was no one else inside. The government argued that these "suspicious" statements established probable cause and justified a warrantless search of the defendant's home. *Id.* at 689. However, the officer at the side of defendant's home made the decision to break down a side door and initiate a search based only on hearing footsteps within the home. *Id.* at 690. That officer did not hear the defendant's allegedly "suspicious" statement at the door. *Id.* Critically, defendant established that the officer who heard defendant's "suspicious" statements *never* communicated anything to the officer that decided to enter the home. *Id.* Because

9

the officer decided to enter defendant's home without knowledge of the statements giving rise to probable cause, the collective knowledge doctrine was precluded.

Courts in this District, applying Seventh Circuit precedent, have found that where "[the officer] who possessed the knowledge sufficient to establish probable cause" was a part of the agency involved in the investigation, "the collective knowledge" of that agency, rather than one specific officer's knowledge, controls the probable cause inquiry. *Simmons v. Gomez*, 2024 WL 3984274, at *5 (N.D. Ill. Aug. 28, 2024) (Hunt, J.); *see also United States v. Randall*, 947 F.2d 1314, 1319 (7th Cir. 1991) (finding probable cause existed to support an arrest when "the police department possessed a great deal of collective knowledge about [defendant's] involvement in the crimes ultimately charged at the time they effected his arrest"). Accordingly, even where evidence does not "directly reveal the source of [local] officers' information," evidence that "that [local law enforcement] received specific information … from [an FBI agent] who was a key member of the investigative team" suffices to establish collective knowledge. *Nafzger*, 974 F.2d at 911.

### b. *Application of the Collective Knowledge Doctrine to Murchison's Case*

Murchison argues that the collective knowledge doctrine cannot apply here because the government failed to provide specific evidence establishing the "links" in communication between law enforcement. What Murchison claims is missing is evidence of exactly which case agent, if either, received information directly about the "50 ball" call from Agent Barker, and whether Lieutenant Steinke received adequate information from officers with knowledge prior to conducting the stop.

At the evidentiary hearing, Agent Ganley testified that, while he received information from Agent Barker about the intercepted calls, he did not recall "the specific logistics" of how he received it. He could not recall whether he learned of the intercepted calls directly from agents in the wire room or if the wire room initially contacted TFO Aguirre instead. The collective knowledge doctrine only requires that "the officer providing the information—*or the agency for which he works*—

10

[had] facts supporting the level of suspicion required." *Williams*, 627 F.3d at 252–53 (emphasis added). Agent Barker's testimony does establish that an officer at the FBI knew of the specific facts supporting a reasonable suspicion and probable cause. Agent Barker ultimately claimed that he did not "keep it to [himself]" and told the case agents about the "50 ball" call, but could not recall the method he used or the order in which he contacted them (just that he "would have" called and texted). But other sources besides Agent Barker's precise recollection confirm that the call Agent Barker heard was communicated with the CCSP for further action.

Agent Ganley and Lieutenant Steinke both testified that TFO Aguirre was the officer who communicated with Lieutenant Steinke and prompted the stop.[3] The summary of TFO Aguirre's January 26, 2026 interview confirms that on June 29, 2022, he was in fact "aware of the intercepted calls" which gave rise to a reasonable suspicion. That is evidence of communication among officers of the FBI and CCSP. Crucially, the collective knowledge doctrine does not "require[] the officer who conducted a car stop to specify precisely which of his colleagues" possessed knowledge to develop a reasonable suspicion and direct the stop. *United States v. Seay*, 2021 WL 6102994, at *2 (7th Cir. Dec. 22, 2021). What is material is that TFO Aguirre learned about the intercepted calls before he reached out to Lieutenant Steinke.

In addition, Lieutenant Steinke himself did not need to be aware of the details about the "50 ball" call, but merely had to act in reliance on what TFO Aguirre communicated to him. The hearing revealed that Lieutenant Steinke knew, before being directed to surveil the Riverdale Body Shop and conduct the traffic stop, that the CCSP was assisting the FBI with its narcotics

---

[3] TFO Aguirre was interviewed regarding this narcotics investigation on January 26, 2026. Contrary to what Murchison argues, the fact that TFO Aguirre did not specifically state in the interview that he spoke to Lieutenant Steinke is not equivalent to a "statement that he did not talk to Steinke directly" (emphasis added). Nothing in the interview summary "directly contradict[s]" Lieutenant Steinke's testimony that he spoke to TFO Aguirre on June 29, 2022.

investigation and that the FBI might request a traffic stop that day. After learning of the FBI's immediate evidence of a suspected narcotics deal, TFO Aguirre spoke to Lieutenant Steinke, who relayed instructions to the CCSP officers at the ready to assist the FBI. TFO Aguirre identified the exact vehicle for Lieutenant Steinke and his team to stop and where to find it. This evidence is sufficient to establish that Lieutenant Steinke and his team acted in objective reliance on the information provided by TFO Aguirre about the investigation and the subject vehicle.

Murchison argues that because TFO Aguirre was not present at the evidentiary hearing, there is not "specific evidence" to apply the collective knowledge doctrine, citing the out-of-circuit case *United States v. De La Rosa-Calderon*, 511 F. Supp. 3d 1202 (D. Co. 2021). In *De La Rosa-Calderon*, a federal agent radioed out a request to take a defendant into custody, but was unsure whether any law enforcement received the message. The local officer who took the defendant into custody did not testify that she heard the communication but that she was informed of it by a different officer. However, that officer did not testify at the evidentiary hearing to confirm he heard the radio message. Thus, there was "a lack of specific evidence" that the federal agent's radio communications actually reached the detaining officer and that she acted specifically upon the federal agent's request. *Id.* at 1210. The *De La Rose-Calderon* court explained by way of contrast that, had the absent officer "confirmed that he did in fact receive the communication from [federal law enforcement], and acted upon it by bringing the Defendant back to his residence, the application of the vertical collective knowledge doctrine to such facts would be clear." *Id.*

The government presented that evidence here. If the evidence failed to establish that Lieutenant Steinke had knowledge that CCSP was assisting the FBI's narcotics investigation and that he communicated with TFO Aguirre, who was aware of the FBI's suspicions as to Murchison based on surveillance, then there may well be missing "links" in the chain of the collective knowledge doctrine. But the evidence here overcomes the assumption that, as the officer in *Ellis*, Lieutenant

Steinke made the decision to stop and search Murchison's vehicle without hearing anything from any officer working with the FBI (and thus without a reasonable suspicion).

This issue would certainly be more straightforward if law enforcement documented each and every message and phone call among every FBI officer themselves and with every assisting CCSP officers. The investigative record is not an exemplar of meticulous and exacting detail. But there is no "clear-chain-of-knowledge requirement" for the collective knowledge doctrine to apply. *Seay*, 2021 WL 6102994, at *2. The evidence establishes that TFO Aguirre learned of the intercepted calls between Murchison and Montgomery which gave rise to a reasonable suspicion and probable cause, and remained in communication with Lieutenant Steinke over the course of his surveillance. CCSP officers received the instruction to stop a specific vehicle at a specific place with the knowledge that they were assisting the FBI with a narcotics investigation. In other words, the CCSP acted as an "extension" of the FBI in acting upon their information. *See Rodriguez*, 831 F.2d at 166.

In conclusion, the Court finds that there are sufficient facts in the record establishing by a preponderance of the evidence that the FBI developed probable cause to stop and search Murchison through its wiretap and camera surveillance, and communicated information to the CCSP in coordinating its narcotics investigation such that the collective knowledge doctrine applies.

## CONCLUSION

For those reasons, the Court denies Murchison's motion to suppress [216].

**IT IS SO ORDERED.**

Date: 6/2/2026

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge

13